IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2022 Term

**FILED**

**November 17, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0233

LAWYER DISCIPLINARY BOARD,
Petitioner

v.

GREGORY H. SCHILLACE, a member of the West Virginia State Bar,
Respondent

_____
Lawyer Disciplinary Proceeding
Nos. 18-03-093, 18-03-199, 18-03-261, 18-02-362, 18-03-556, 19-03-211, and 19-03-253

LAW LICENSE SUSPENDED AND OTHER SANCTIONS IMPOSED
_____

Submitted: September 28, 2022
Filed: November 17, 2022

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Petitioner's Counsel

Timothy J. Manchin, Esq.
Manchin Injury Law Group, P.L.L.C.
Fairmont, West Virginia
Respondent's Counsel

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WOOTON dissents and reserves the right to file a separate opinion.

SYLLABUS BY THE COURT

1.    "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("HPS")] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syllabus Point 1, *LDB v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021) (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. McCorckle*, 192 W. Va. 286, 452 S.E.2d 377 (1994)).

2.    "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law."  Syllabus Point 2, *LDB v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021) (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)).

3.    "Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system or to the profession; (2) whether the lawyer acted intentionally, knowingly or

i

negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors." Syllabus Point 4, *Off. Law. Disc. Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998).

4.     "Aggravating factors in lawyer disciplinary proceedings are any considerations or factors that may justify an increase in the degree of discipline to be imposed." Syllabus Point 4, *LDB v. Scott*, 213 W. Va. 209, 579 S.E.2d 550 (2003).

5.     "In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession." Syllabus Point 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987) (citing W. Va. R. Law. Disc. P. 3.16).

WALKER, Justice:

Over the course of several years, Gregory H. Schillace repeatedly agreed to represent clients but then abandoned his duties and responsibilities, leaving them with virtually no legal representation. His misconduct cost his former clients their legal rights, property, peace of mind, and trust in the legal system; he also contributed to public distrust of the legal profession. A hearing panel subcommittee of the Lawyer Disciplinary Board found that he committed fifty-three ethics violations but recommends we impose no active suspension of his law license. It reasoned that Respondent's diagnosed mental impairment mitigates against harsher sanctions.

We recognize how Respondent's mental impairment affected his client representation, and we afford it due mitigating weight. We also commend his actions to address it, and we acknowledge his continued efforts toward mental health recovery. But his impairment does not insulate him from meaningful sanctions. We find that it mitigates his sanction to a two-year suspension, among other sanctions. Without significant mitigation, Respondent's misconduct would warrant more than a two-year suspension.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

---

[1] *See e.g. LDB v. Rossi*, 234 W. Va. 675, 686, 769 S.E.2d 464, 475 (2015) (suspending a lawyer's license for three years for, among other things, being "unresponsive to his clients in . . . six matters and caused them real injuries.").

1

Respondent has practiced law in West Virginia since 1990. On March 16, 2020, the Lawyer Disciplinary Board filed a seven-count Statement of Charges against him, alleging dozens of ethics violations. A subcommittee of the Board's Hearing Panel (the Hearing Panel Subcommittee or HPS) conducted hearings on the charges on November 24, 2020, November 25, 2020, and March 2, 2021. Respondent, aggrieved clients, a circuit court judge who witnessed some of Respondent's misconduct, and several mitigation witnesses testified at the hearings. The mitigation witnesses discussed, among other things, Respondent's adjustment disorder and how it affected his client representation. Based on the evidence, the HPS made the following findings for each count.[2]

## A.      *Count I*

The HPS found that clients retained Respondent sometime in 2016 to represent them in a claim against their home contractor. Respondent never reduced the

---

[2]  After the HPS issued its report and recommended disposition to this Court, the Office of Disciplinary Counsel (ODC) filed an objection to the HPS's recommended disposition. In response, Respondent consented to the recommended disposition, but he noted his objections to certain findings of facts and rule violations found. On appeal, he restates his objections but presents no argument explaining why we should disturb the HPS's findings as to facts or rule violations. Instead, he presents, with no supporting arguments, the statement of facts and rule violations he claims the HPS should have adopted for each count. "The filing of any objection to the report of the Hearing Panel Subcommittee shall constitute commencement of proceedings . . . before the Supreme Court of Appeals[,]" but it does not carry a party's burden of proving error below. *See* W. Va. R. Law. Disc. P. 3.13. In the absence of arguments by Respondent, we decline to disturb the HPS's factual findings or the rule violations it found; clear and convincing evidence supports the findings.

scope or terms of his representation to writing. Respondent filed suit on the clients' behalf on June 7, 2016. The contractor filed a counterclaim, but Respondent never responded to it or informed the clients of it. As the case proceeded, Respondent failed to communicate with them about the case. By the close of discovery, Respondent had failed to answer interrogatories, so the circuit court ordered that he file the discovery responses by July 21, 2017. Respondent filed the responses ten days late, on July 31, 2017. When opposing counsel moved for sanctions, Respondent did not respond, and the court ordered Respondent to pay attorney fees as a sanction. On November 30, 2017, opposing counsel moved for sanctions again, citing Respondent's systematic failure to obey the court's orders or the discovery rules. This time, opposing counsel requested that the court dismiss the clients' claims due to Respondent's pattern of misconduct. Respondent never responded to the motion. The circuit court dismissed the clients' claims with prejudice but allowed the opposing party's counterclaim to proceed.

Respondent did not inform his clients that the court dismissed their claims and continued to withhold information about the counterclaim—despite the clients' extensive efforts to get status updates on their case. By January 31, 2018, Respondent still had not responded to the counterclaim. The defense moved for a default judgment, and the circuit court granted it on March 1, 2018. Shortly before the damages trial for the default judgment, Respondent informed the clients of the counterclaim and that the circuit court dismissed their claims. The clients retained new counsel and settled the counterclaim for

3

$20,000 before trial. Respondent's professional malpractice insurance carrier eventually made the clients financially whole by settling a malpractice lawsuit.

Based on these findings, the HPS found that Respondent violated Rules 1.1, 1.2(a), 1.3, 1.4, 1.5(b), 1.5(c), 3.2, 3.4, 8.4(c), and 8.4(d) of the West Virginia Rules of Professional Conduct.

## B.    *Count II*

The HPS found that a client retained Respondent sometime around January 2017 to represent her in a suit against her former employer, which her previous attorney filed on October 26, 2015. After the client and Respondent entered into a contingency fee agreement, Respondent failed to communicate with the client or respond to her requests for status updates on her case. On December 8, 2017, the client learned that opposing counsel filed a motion to dismiss for Respondent's failure to prosecute. She attempted to contact Respondent about the motion, but he never responded. After Respondent failed to respond when the court ordered him to do so, the court dismissed the client's lawsuit. Respondent baselessly assured the client that the circuit court would reinstate the case, but he made no effort toward reinstatement.

The client then filed an ethics complaint against Respondent, which Respondent initially ignored. When he responded to the ODC's second demand for a

response, he denied any ethics violations and said he would have the case reinstated. In response, the client reiterated to the ODC that Respondent made no effort to reinstate the case and had done nothing in the seven months following the dismissal.

Based on these findings, the HPS found that Respondent violated Rules 1.1, 1.2(a),1.3, 1.4, 3.2, 3.4, 8.4(c), and 8.4(d) of the West Virginia Rules of Professional Conduct.

## C.    *Count III*

The HPS found that a client retained Respondent to represent him in a divorce action. After the family court entered a final order in the case on December 21, 2016, Respondent appealed it to the circuit court. The family court then scheduled a May 1, 2017 hearing on a contempt motion filed against the client for allegedly violating the family court's order. At the hearing, Respondent argued that the family court lacked jurisdiction while the case was pending in the circuit court. The family court continued the hearing to May 2. On May 1, the circuit court stayed proceedings in the family court. So, Respondent did not attend the continued May 2 hearing.

After the parties settled the underlying case, the family court issued an order to show cause against Respondent for his failure to appear at the May 2 hearing. Respondent filed a complaint for declaratory relief and petition for writ of prohibition in

the circuit court against the family court judge related to the order to show cause, but Respondent failed to serve the family court judge with the complaint. So, the circuit court continued a hearing for the case and ordered Respondent to serve the family court judge before the next hearing. The circuit court also ordered Respondent to prepare an order reflecting its directives. The family court judge filed a motion to dismiss the petition for writ of prohibition. Respondent failed to appear for a hearing on that motion. Respondent also failed to serve the family court judge or prepare the order. So, the circuit court imposed a monetary sanction on Respondent, halted proceedings in the client's case until Respondent paid the sanction, and filed an ethics complaint against him.

The ODC sent Respondent the ethics complaint and demanded a response within twenty days, but Respondent failed to respond to the ODC by the initial deadline. When he responded late, he assured the ODC that he would pay the monetary sanctions so that the circuit court would allow the client's case to proceed. But the circuit court provided the ODC with a transcript of a later hearing where Respondent admitted he had not paid the sanction and refused to do so. After Respondent refused to pay the sanction, the circuit court reduced it to a civil judgment. Respondent appealed the sanction to this Court. We reversed, in part, finding that the circuit court abused its discretion by issuing the contempt

6

sanction without a jury trial.[3]  The HPS found insufficient evidence to find any ethics violations related to this count because of this Court's decision to invalidate the sanction.

**D.     *Count IV***

The HPS found that a client retained Respondent to defend her in a contract dispute related to an equipment purchase for her business.  The equipment supplier sued her sometime around May 2, 2014, for an alleged failure to pay.  She requested that Respondent file a counterclaim alleging breach of contract for the supplier's alleged failure to tender the goods in working condition.  But Respondent never asserted the counterclaim. After the circuit court set the case for trial,  Respondent never served discovery requests or took depositions.  And Respondent never filed any pretrial motions, exhibits, or jury instructions, and he missed a February 10, 2017, docket call for the case.

Before trial, the plaintiff presented a settlement offer to Respondent, but Respondent failed to communicate it to his client before it expired.  At trial, the circuit court sanctioned Respondent for his discovery misconduct by excluding the client's testimony.   And the client learned at the trial that Respondent failed to assert the counterclaim.   The jury awarded $31,500 to the plaintiffs.   Even though Respondent promised the client that he would appeal, he never did.  The client filed an ethics complaint, and Respondent failed to respond to the ODC's first request for a response.  The client filed

---

[3] *Rector v. Ross*, 245 W. Va. 352, 360, 859 S.E.2d 295, 303 (2021).

a legal malpractice claim against Respondent. She testified below that Respondent never apologized to her for his misconduct.

Based on these findings, the HPS found that Respondent violated Rules 1.1, 1.2(a), 1.3, 1.4, 3.2, 3.4, 3.4(d), 8.4(c), and 8.4(d) of the West Virginia Rules of Professional Conduct.

**E.     *Count V***

The HPS found that clients retained Respondent to represent them in an August 15, 2016, partition lawsuit related to jointly inherited property. Respondent's associate attorney attended a December 12, 2016 status conference on his behalf. At the conference, the circuit court emphasized that Respondent failed to respond to the lawsuit or participate in discovery. On December 27, 2016, the circuit court entered an order directing Respondent to respond to the lawsuit within 20 days. Respondent did not, and on January 23, 2017, the plaintiffs filed a Motion to Appoint Commissioners and Adopt Factual Matters for the partition action. Respondent never responded to the motion, and the circuit court granted it.

The circuit court ordered that the partition commissioners ignore any evidence on the clients' behalf because Respondent abandoned the case. The commissioners issued recommended findings, leaving the clients with an undesirable

portion of the property. Respondent did not provide a copy to the clients, and he withheld the adverse ruling from them. On July 23, 2018, the circuit court adopted the recommended findings. The clients only learned of the adverse rulings when they tried to pay property taxes to an opposing party who informed them that the circuit court ruled on the case. The clients demanded an explanation from Respondent who assured them he would "look at it." The clients also demanded their client file, but Respondent withheld it.

The clients filed an ethics complaint and hired counsel to recover the client file, but Respondent still withheld it. Respondent ignored the ODC's first request for a response. He answered the ODC's second request and claimed he acted ethically in the matter. Respondent's malpractice insurance carrier settled a malpractice suit, arguably making the clients financially whole. But the clients testified that the settlement proceeds failed to provide them with sufficient redress because they still lacked access to their beloved family property.

Based on these findings, the HPS found that Respondent violated Rules 1.1, 1.2(a), 1.3, 1.4, 1.16(d), 1.5, 1.15(d), 1.16(d), 3.2, 3.4, 8.4 (c), and 8.4 (d) of the West Virginia Rules of Professional Conduct.

**F.     *Count VI***

The HPS found that a client retained Respondent in September 2018 to represent her in a real estate suit against an adjoining property owner. The client paid Respondent a $3,500 retainer, but Respondent never reduced the fee agreement to writing. He assured the client that he would file suit, but he then ignored the client's communications over the next several months.

On April 12, 2019, the client contacted the circuit court clerk's office and learned that Respondent never filed the complaint. On April 17, 2019, the client mailed Respondent a letter terminating his representation and requesting a retainer refund and her client file. Respondent met with the client four days after receiving her termination letter. To the client's dismay, he conducted an intake with her like he had at their initial meeting. The client informed Respondent that she had no more money to replenish her retainer. Respondent convinced her that he would file the suit and represent her under a contingency fee agreement. He also assured her that he would file suit by April 29, 2019, but he did not. He later promised that he would file it by May 6, 2019, and the client tried to contact him to confirm that he had, but he ignored her. The client went to the clerk's office on May 10, 2019, where she learned that Respondent still had not filed the complaint. The client again requested a refund of her retainer and her client file, but Respondent returned neither.

The client filed an ethics complaint, and Respondent ignored the ODC's request for a response. When Respondent responded to ODC's second request, he denied committing any ethics violations.

Based on these findings, the HPS found that Respondent violated Rules 1.2(a), 1.3, 1.4, 1.5(b), 1.5, 1.15(b), 1.15(d), 1.16(d), 8.4(c) and 8.4(d) of the West Virginia Rules of Professional Conduct.

## G.     *Count VII*

The HPS found that a client retained Respondent to represent him in an April 15, 2016, lawsuit against his former employer. Respondent failed to disclose witnesses or respond to discovery requests, as the circuit court's order required. Opposing counsel repeatedly attempted to contact Respondent about his failures, but Respondent ignored the attempts. On August 7, 2017, opposing counsel filed a motion for sanctions and, alternatively, a motion to compel the discovery. Respondent did not respond.

Respondent failed to instruct his client to attend an August 28, 2017, pretrial hearing. When Respondent attended the hearing, he admitted that he failed to prosecute the case, and the circuit court dismissed it. Respondent never informed the client that the circuit court dismissed the case. The client only learned about it when he hired a new lawyer to represent him.

11

The client filed an ethics complaint against Respondent. Respondent ignored ODC's first request for a response. He responded to ODC's second request and denied committing any ethics violations. His malpractice insurance carrier eventually made the clients financially whole by settling a malpractice claim.

Based on these findings, the HPS found that Respondent violated Rules 1.1, 1.2(a), 1.3, 1.4, 3.2, and 3.4 of the West Virginia Rules of Professional Conduct.

## H.     *Recommended Sanction*

In all, the Hearing Panel Subcommittee found that Respondent committed fifty-three ethics violations. As discipline for the misconduct, the HPS recommends that we impose various sanctions against him, including a stay of a two-year suspension of his law license:

> [The HPS recommends]
>
> A.  That Respondent's law license be suspended for a period of two years, provided that the imposition of that suspension is stayed and the Respondent [be] placed on a period of [t]hree (3) years of probation and supervised practice;
>
> B.  That Respondent must maintain [p]rofessional [l]iability [i]nsurance in the amount of [o]ne [m]illion [d]ollars ($1,000,000) per claim and in the aggregate and provide proof of the same upon request of the Office of Disciplinary Counsel;
>
> C.  That Respondent should continue in the therapy regimen and undergo an independent psychological evaluation to determine his compliance with his therapy regiment at his

expense and at the request of the Office of Disciplinary Counsel;

D. Respondent should undergo an audit of his law office to determine if he is compliant with the prior directives of the retained office consultant, and be ordered to implement any and all necessary changes in his law office management procedures to ensure that the pattern of misconduct is less likely to occur; and

E. That Respondent be ordered to pay the costs of these proceedings pursuant to Rule 3.15 of the Rules of Lawyer Disciplinary Procedure.

The ODC objects to the recommended sanctions, mainly the stayed suspension. It advocates for (1) two years' active suspension of Respondent's law license, (2) Respondent's compliance with Rule 3.28 of the Rules of Lawyer Disciplinary Procedure, (3) Respondent's continued therapy, (4) an independent psychological evaluation of Respondent and a law office audit before reinstatement, (5) Respondent to carry $1,000,000 of professional liability insurance per claim and in the aggregate, if reinstated, and (6) Respondent to bear the costs of his disciplinary proceedings.

## II. STANDARD OF REVIEW

In lawyer discipline cases, we review questions of law de novo, defer to the HPS's supported factual findings, and exercise our independent judgment to determine appropriate sanctions:

A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee of the Lawyer Disciplinary Board ("HPS")] as

13

to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [HPS's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [HPS's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.[4]

We respectfully consider the HPS's recommended sanctions, but "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions[,] or annulments of attorneys' licenses to practice law."[5]

## III.  ANALYSIS

The Rules of Lawyer Disciplinary Procedure contemplate a variety of possible disciplinary sanctions, ranging in severity from an admonishment to law license annulment:

A Hearing Panel Subcommittee may recommend or the Supreme Court of Appeals may impose any one or more of the following sanctions for a violation of the Rules of Professional Conduct or pursuant to Rule 3.14: (1) probation; (2) restitution; (3) limitation on the nature or extent of future practice; (4) supervised practice; (5) community service; (6) admonishment; (7) reprimand; (8) suspension; or (9) annulment . . . .[6]

---

[4] Syl. Pt. 1, *LDB v. Cain*, 245 W. Va. 693, 865 S.E.2d 95 (2021) (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. McCorckle*, 192 W. Va. 286, 452 S.E.2d 377 (1994)).

[5] Syl. Pt. 2, *Cain*, 245 W. Va. at 693, 865 S.E.2d at 95 (quoting Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984)).

[6] W. Va. R. Law. Disc. P. 3.15.

To determine appropriate sanctions, we consider a lawyer's professional duties, culpable mental state, injury inflicted, and any mitigating or aggravating factors:

> Rule 3.16 of the West Virginia Rules of Lawyer Disciplinary Procedure enumerates factors to be considered in imposing sanctions and provides as follows: (1) whether the lawyer has violated a duty owed to a client, to the public, to the legal system or to the profession; (2) whether the lawyer acted intentionally, knowingly or negligently; (3) the amount of the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of any aggravating or mitigating factors.[7]

The HPS found that (1) "Respondent's pattern and course of misconduct breached his duties to his clients, the legal system, and to the profession[,]" (2) he acted negligently, (3) he caused harm to his clients and the legal profession, and (4) that his mental impairment heavily mitigated his misconduct. The HPS found no aggravating factors.

We disagree with the HPS's assessment of several factors and independently analyze all factors below. But first, we briefly highlight the HPS's erroneous insufficient evidence finding for Respondent's conduct in Count III; Respondent committed several ethics violations unrelated to the merits of the contempt action against him. His successful appeal based on procedural defects in the contempt proceedings fails to excuse his

---

[7] Syl. Pt. 4, *Off. Law. Disc. Couns. v. Jordan*, 204 W. Va. 495, 513 S.E.2d 722 (1998) (citing W. Va. R. Law. Disc. P. 3.16).

15

disrespectful and dishonest conduct before the circuit court or the ODC. We even acknowledged his misconduct when we decided the appeal. As now-Chief Justice Hutchison noted in his concurrence,

> the record shows that despite the sanction, Mr. Schillace continued to defy the circuit court, claiming in one instance that he believed the sanction was prophylactic in nature, and therefore, he did not need to pay it. Moreover, Mr. Schillace continued to argue that he had submitted the December 11, 2017, hearing order to the circuit court prior to March 30, 2018, hearing, offering an unsigned letter at a July 13, 2018, hearing that he had obviously just printed from his computer as proof. Based on what had occurred at the March 30, 2018, hearing, the circuit court knew that he had not previously submitted the order.[8]

Respondent disregarded the circuit court's orders to serve the family court judge or prepare an order. He violated the ODC's response deadline. And he misrepresented to the ODC that he would pay the sanction to avoid further prejudicing his client but took the opposite position before the circuit court. For these reasons, we find clear and convincing evidence to support the ODC's charged rule violations for this count; Respondent violated Rules 1.1, 3.3(a)(1), 8.4(c), and 8.4(d) of the West Virginia Rules of Professional Conduct.

## A.   *Professional Duties*

---

[8] *Ross*, 245 W. Va. at 362, 859 S.E.2d at 304 (Hutchison, J. concurring).

With the framework for our analysis established and Respondent's rule violations clarified, we move to discussion of the first *Jordan* factor: Respondent's professional duties. As we have explained, lawyers owe basic duties to their clients, the public, and the legal profession:

> A lawyer owes an ethical duty to clients including the duty of candor, loyalty, diligence, and competence. Lawyers also owe duties to the public who rely on lawyers to protect their interests. The general public deserves lawyers with the highest standards of honesty and integrity. As officers of the court, lawyers owe duties to the legal system whereby they must conduct themselves within the bounds of the law and abide by the rules of substance and procedure which afford the administration of justice. As to the legal profession, lawyers owe an ethical duty to maintain the integrity of the profession.[9]

Respondent admits he violated duties to his clients, the legal system, and the profession, and we agree. Specifically, Respondent repeatedly violated his duties of candor, loyalty, diligence, and competence owed to his clients; over and over, he promised to represent their interests but failed to pursue them. For the same reason, he violated his duties to the public which depends on lawyers to navigate the legal system. And he breached his duties to the legal profession and system by violating our Rules of Professional Conduct.

**B.    *Culpable Mental State***

---

[9] *LDB v. Blyler*, 237 W. Va. 325, 341, 787 S.E.2d 596, 612 (2016).

There being no issue as to Respondent's violations of duties as a lawyer, we next turn to his culpability. In lawyer discipline cases, we deem intent the most culpable mental state and negligence the least culpable; a knowing mental state demonstrates culpability somewhere between the two:

> the most culpable mental state is that of intent, which consists of conduct by the lawyer with a conscious objective or purpose to achieve a particular result. The next most culpable mental state is that of knowledge when there are acts by the lawyer with awareness of the nature of the acts or the potential consequences of the conduct. However, with the state of knowledge there is no conscious effort to attain a particular result. The least culpable mental state is negligence, which involves a failure to be aware of substantial risks at issue.[10]

The HPS found that Respondent acted negligently because "his course of conduct occurred during a time when [he] suffered a series of medical and mental health issues which were temporary in nature and for which he has taken substantial steps to correct." The ODC argues that Respondent acted knowingly and that he failed to present evidence showing that his mental impairment prevented him from appreciating the nature of his misconduct.

We agree with the ODC; based on the indisputable evidence presented to the HPS, we must conclude that Respondent acted knowingly. We acknowledge that a clinical

---

10 *Id.*

18

social worker evaluated Respondent and assessed him with an adjustment disorder. And the social worker testified that with the disorder, Respondent "developed the capacity to avoid [and] became less productive." But he never deemed Respondent incapable of understanding his action's consequences. Respondent's mental impairment may mitigate the degree of discipline for his conduct, but it fails to rebut the evidence showing he understood the adverse effects his clients suffered when he lied to and abandoned them. Throughout the underlying cases, courts issued sanctions against Respondent, clients complained to him about his misconduct, and the ODC sent him multiple complaints related to it. Respondent's decades of law practice should have apprised him of his misconduct's consequences. But if it did not, the non-approval from the courts, his clients, and the ODC brought them to his attention.

We find that Respondent acted knowingly when he consistently disregarded his clients' interests and the lower courts' authority. He may have acted negligently in some circumstances, but his continuous pattern, over the course of many years and cases, demonstrates that he understood the consequences of his misconduct.

## C. *Injury Inflicted*

When determining an appropriate sanction, we consider actual and potential injury to the client, the public, and the legal system.[11] As another state supreme court noted, "The level of injury can range from 'serious' injury to 'little or no' injury."[12] When a lawyer insists that remedial measures cured their former clients' injuries, we have emphasized that case delay and understandable frustration with the system establish actual injury.[13]

The HPS found that Respondent caused damage, but it minimized the harm's magnitude by finding, "Respondent has been financially responsible for his malpractice[,] and it appears . . . that settlements were reached with the clients that filed suit against him."

We disagree with the HPS's suggestion that Respondent's malpractice insurance settlements negated his inflicted injuries. For one, a former client testified that Respondent assured her that his insurance company would compensate her for her financial injuries. But she explained,

> I had to file multiple Freedom of Information requests to get the names of his insurance company. He told us multiple times that he was going to contact them and get the claim filed.

---

[11] *See* W. Va. R. Law. Disc. P. 3.16.

[12] *In re Vanderslice*, No. 261, 2015, 2015 WL 3858865, at *12 (Del. June 19, 2015).

[13] *See e.g. LDB v. Munoz*, 240 W. Va. 42, 49, 807 S.E.2d 290, 297 (2017) ("Although [the lawyer] attempts to minimize any client [injury], the obvious injury to them was the delay of resolution of their cases and their understandable frustration with the system.").

20

> He was going to do that himself. He refused. He would not do that. I asked him for the names of his insurance carrier. He refused to supply that information. I took it upon myself to submit FOIA requests to get that information.

And she emphasized, "His insurance company settled. He did nothing to help promote that." Likewise, she testified, "the amount of stress and just anxiety that we had to go through to get to that point, [the insurance] settlement nowhere near covered it." The client who lost his rights in the partition action testified, "at nighttime I wake up in the middle of the night and I start crying because my kids loved to go there . . . ." Another former client testified, "I'm hurt. I just—from a professional ethics standpoint, I just don't think that you should be allowed to ignore people and to not do what you're supposed to do to represent them. So—and it's been—it's difficult to accept."

The record in this case is full of similar stories, but these emphasize the point: a lawyer can inflict more than financial injury when he violates our Rules of Professional Conduct. Malpractice insurance settlements do not unilaterally cure the injuries. Respondent inflicted actual, serious harm.

### D. *Mitigating Factors*

We next turn to mitigating factors, which we have explained are "any considerations or factors that may justify a reduction in the degree of discipline to be

imposed."[14]  We have also adopted the American Bar Association's proposed mitigating factors as a baseline for our application.  The factors include:

> (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith effort to make restitution or to rectify consequences of misconduct; (5) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (6) inexperience in the practice of law; (7) character or reputation; (8) physical or mental disability or impairment; (9) delay in disciplinary proceedings; (10) interim rehabilitation; (11) imposition of other penalties or sanctions; (12) remorse; and (13) remoteness of prior offenses.[15]

We consider mental impairments as mitigating factors when medical evidence establishes the mental impairment and that it caused the lawyer's misconduct; the lawyer must also prove a "meaningful and sustained" rehabilitation period, that he has ceased the misconduct, and that he is unlikely to reoffend:

> [w]e hold that in a lawyer disciplinary proceeding, a mental disability is considered mitigating when:  (1) there is medical evidence that the attorney is affected by a mental disability; (2) the mental disability caused the misconduct; (3) the attorney's recovery from the mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.[16]

---

[14] *LDB v. Scott*, 213 W. Va. 209, 214, 579 S.E.2d 550, 555 (2003) (citing American Bar Association, *Standards for Imposing Lawyer Sanctions*, 9.31 (1992)).

[15] *Scott*, 213 W. Va. at 214, 579 S.E.2d at 550 (quoting *Standards for Imposing Lawyer Sanctions*, *supra* note 14, at 9.32).

[16] *LDB v. Dues*, 218 W. Va. 104, 112, 624 S.E.2d 125, 133 (2005) (quoting *Standards for Imposing Lawyer Sanctions*, *supra* note 14, at 9.32).

We afford mental impairments varying weight as mitigation, depending on the causal connection between the impairment and the misconduct:

> If the offense is proven to be attributable solely to a [mental] disability . . ., it should be given the *greatest weight*. If it is principally responsible for the offense, it should be given *very great weight;* and if it is a substantial contributing cause of the offense, it should be given *great weight.* In all other cases in which the [mental] disability . . . is considered as mitigating, it should be given *little weight*.[17]

In this case, the HPS found that Respondent's mental impairment, counseling regimen, and law office remediation measures constituted mitigating factors. The HPS found that Respondent's mental impairment served as a "substantial cause" of his misconduct, that his client representation since receiving the Statement of Charges showed his rehabilitation, and that his counselor's testimony proved him unlikely to reoffend.

Respondent asks us to find as mitigating factors his (1) absence of prior discipline, (2) absence of dishonest or selfish motive, (3) personal and emotional problems, (4) restitution, (5) participation in disciplinary proceedings, (6) character and reputation, (7) mental disability, (8) interim rehabilitation, (9) imposition of other penalties or sanction, and (10) remorse.[18] But we deem as mitigating factors only his personal and

---

[17] *Dues*, 218 W. Va. at 112, 624 S.E.2d at 133 (quoting BA/BNA Lawyers' Manual on Professional Conduct, at 01:840 (2005)).

[18] We reject many of Respondent's proposed mitigating factors. Respondent's disciplinary record does not represent a mitigating factor. The Investigative Panel

emotional problems, mental impairment, interim rehabilitation, and character and reputation.

Respondent's mental impairment, personal and emotional problems, and interim rehabilitation substantially overlap, so we will discuss them together. Respondent's mental health counselor established that Respondent suffered from an adjustment disorder. He attributed the mental impairment to Respondent's grief, stress, and other emotional challenges. He testified that he has treated Respondent weekly since assessing him with the adjustment disorder, that Respondent's counseling has improved it, and that continued treatment will likely prevent his misconduct from reoccurring. Because the counselor also established how Respondent's mental impairment served as a substantial contributing factor to his misconduct, we afford it great mitigating weight. We also afford

---

admonished him in 2015, and it did not deter the misconduct underlying this disciplinary action that soon followed. Respondent presented insufficient evidence to show that he acted without a dishonest or selfish motive. Instead, he acted dishonestly in many cases by withholding crucial, detrimental information from his clients until he could no longer hide it. Respondent's "restitution" or imposition of other "penalties" do not constitute mitigating factors. He argues that his malpractice insurance settlements should mitigate his discipline. For the reasons stated above, we reject this argument. And Respondent's participation in the disciplinary proceedings does not mitigate in this case; he ignored numerous ODC response requests issued prior to the Statement of Charges. Finally, Respondent failed to demonstrate remorse sufficient to mitigate his misconduct. He may have acted remorsefully during the HPS hearing, but we find it telling a former client testified that Respondent never apologized to her. Respondent should have directed his remorse towards his injured clients, not the HPS.

24

mitigating weight to his interim rehabilitation and the personal and his emotional problems related to the adjustment disorder.

Finally, we deem Respondent's character and reputation a mitigating factor. He presented United States Magistrate Michael J. Aloi as a mitigation witness. Judge Aloi met with Respondent in early 2018 in his capacity as volunteer for the West Virginia Judicial and Lawyers' Assistance Program (WVJLAP).[19] Judge Aloi knew Respondent for many years before meeting with him then. He testified about Respondent's reputation as a friend and great lawyer, and he emphasized that Respondent's misconduct appeared uncharacteristic of the character and reputation he established in the years preceding. We find the testimony persuasive and afford Respondent's character and reputation mitigating weight.

### E.    *Aggravating Factors*

We have held that "[a]ggravating factors in lawyer disciplinary proceedings are any considerations or factors that may justify an increase in the degree of discipline to

---

[19] Magistrate Judge Aloi testified that he met with Respondent after the WVJLAP received referrals from persons concerned about Respondent's well-being. The record contains no indication that Respondent sought assistance from the WVJLAP on his own initiative or has any ongoing involvement with it.

be imposed."[20]   The American Bar Association's *Standards for Imposing Lawyer Sanctions* lists the following as aggravating factors in lawyer disciplinary cases:

> (a) prior disciplinary offenses;
> (b) dishonest or selfish motive;
> (c) a pattern of misconduct;
> (d) multiple offenses;
> (e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency;
> (f) submission of false evidence, false statements, other deceptive practices during the disciplinary process;
> (g) refusal to acknowledge wrongful nature of conduct;
> (h) vulnerability of victim;
> (i) substantial experience in the practice of law;
> (j) indifference to making restitution;
> (k) illegal conduct, including the use of controlled substances.[21]

In this case, the HPS found no aggravating factors. In contrast, the ODC asserts as aggravating factors Respondent's (1) 2015 admonishment by the Lawyer Disciplinary Board, (2) selfish motive as reflected by his misleading statements to clients, (3) pattern of misconduct, (4) multiple offenses, and (5) substantial legal experience. But we find as aggravating factors only Respondent's selfish motive, pattern of misconduct, multiple offenses, and substantial legal experience.

---

[20] Syl. Pt. 4, *Scott*, 213 W. Va. at 209, 579 S.E.2d at 550.

[21] American Bar Association, *Standards for Imposing Lawyer Sanctions*, 9.22 (2019).

First, we find that in the circumstances of this case, Respondent's prior admonishment does not represent an aggravating factor. But we agree with the ODC's other asserted aggravating factors. Respondent's conduct demonstrates selfish and dishonest motives, the seven counts against him establish a course of misconduct and multiple offenses, and he committed the misconduct despite his nearly three decades practicing law.

The record contains clear and convincing evidence showing that Respondent acted dishonestly and selfishly in many instances. For one, he withheld damaging information from his clients until he could no longer hide it. He also incorrectly assured several former clients that he could cure adverse rulings against them but took no action to do so. We find his actions reflected in Count VI illustrative. Respondent accepted the client's case and assured her that he would file suit. He depleted her $3,500 retainer without filing a complaint, as promised, and he ignored her extensive efforts to contact him. When she mailed a letter terminating his representation and requesting a retainer refund, he promptly arranged a meeting with her and convinced her to keep him retained on a contingency basis—despite his preexisting and unfulfilled duties under the unwritten retainer fee agreement. The record highlights countless times when Respondent abdicated his duties and ignored communications, but when his money was at stake, he acted promptly.

27

We find that Respondent's selfish and dishonest motives, course of misconduct, multiple offense, and substantial legal experience are aggravating factors.

## F.    *Sanctions*

We craft sanctions to punish attorneys, protect the public, and restore confidence in the legal profession:

> In deciding on the appropriate disciplinary action for ethical violations, this Court must consider not only what steps would appropriately punish the respondent attorney, but also whether the discipline imposed is adequate to serve as an effective deterrent to other members of the Bar and at the same time restore public confidence in the ethical standards of the legal profession.[22]

In *LDB v. Grafton*, we suspended the lawyer's license for two years after he "continued in a pattern and practice of repeatedly failing to communicate with and for his clients, and not responding to requests of the ODC . . . . [And he] also deceived his client by allowing her to believe that he was acting diligently and an appeal had been perfected in her case."[23]    To determine the appropriate discipline, we considered the lawyer's significant physical impairment and remorse as mitigating factors; as aggravating factors, we considered his pattern of misconduct, significant legal experience, dishonest motive,

---

[22]  Syl. Pt. 3, *Comm. on Legal Ethics v. Walker*, 178 W. Va. 150, 358 S.E.2d 234 (1987).

[23]  227 W. Va. 579, 587, 712 S.E.2d 488, 496 (2011).

and violation of this Court's order related to a trustee's inventory of his client files.[24] Similarly, in *LDB v. Hardin*, we suspended the lawyer's license for two years for disobeying discovery orders, missing hearings, and ignoring circuit court sanctions.[25] To determine the appropriate discipline, we considered as mitigating factors the lawyer's clean disciplinary record, lack of dishonest motives, and remorseful conduct; we considered no aggravating factors.[26]

Respondent's conduct compares to the lawyers' conduct in *Grafton* and *Hardin*. Like the lawyer in *Grafton*, Respondent knowingly ignored communications from his clients and the ODC. Like the lawyer in *Hardin*, Respondent knowingly violated several court orders and failed to represent his clients diligently. In both cases, we imposed two-year, active suspensions after considering mitigating evidence; in *Hardin* we suspended the lawyer without finding any aggravating circumstances. We recognize that "[t]here is no 'magic formula' for this Court to determine how to weigh the host of mitigating and aggravating circumstances to arrive at an appropriate sanction . . . ."[27] But given our previous decisions and the countervailing aggravating factors present in this case,

---

[24] *Id*.

[25] 217 W. Va. 659, 661, 619 S.E.2d 172, 174 (2005) (per curiam).

[26] *Id.*

[27] *LDB v. Sirk*, 240 W. Va. 274, 282, 810 S.E.2d 276, 284 (2018).

we find that Respondent's mental impairment and other mitigating factors reduce his sanction to an active, two-year suspension, among other sanctions. The HPS's suggestion that his mental impairment mitigated the sanction to no active suspension is not consistent with our precedent. And without imposing substantial consequences, we fail to deter similar attorney misconduct or restore confidence in the profession.

## IV. CONCLUSION

For the above reasons, we impose the following sanctions: (1) we suspend Respondent's law license for two years; (2) we refer Respondent to the WVJLAP for evaluation, treatment recommendation, and monitoring, if deemed necessary, and reinstatement shall be conditioned on full compliance with any such recommendations[28]; (3) as a condition of reinstatement, Respondent must demonstrate that he has satisfied and paid in full pay any outstanding sanctions, penalties, or obligations owed to any tribunal in

---

[28] While we include this condition as a sanction, we do not intend it as punishment. The WVJLAP's purposes align with the objectives to protect the public, and we believe it possesses resources to aid Respondent's continued recovery from his mental impairment. Indeed, this Court established the WVJLAP for, among other things, the following purposes:

(1) To protect the interests of clients and the general public from harm caused by impaired members of the legal profession; [and]

(2) To assist impaired members of the legal profession to begin and continue recovery[.]

R. W. Va. Jud. and Law. Assist. Program 1(b)(1)-(2).

30

this State and all expenses related to the underlying disciplinary proceedings; and (4) if reinstated, Respondent shall maintain $1,000,000 in professional malpractice insurance, per claim, and in the aggregate.

Law license suspended and other sanctions imposed.